**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

|  |  |  |
|---|---|---|
| JOHN W. CREAMER, III, | : | |
| | : | Civil Action No. 17-6253(RMB) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| STEVEN JOHNSON and | : | |
| THE ATTORNEY GENERAL OF | : | |
| THE STATE OF NEW JERSEY, | : | |
| | : | |
| Respondents. | : | |
| | : | |

**BUMB**, District Judge

This matter comes before the Court upon the Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (Pet., ECF No. 1) filed by Petitioner John W. Creamer, III ("Petitioner"), an inmate confined in New Jersey State Prison in Trenton, New Jersey. Respondents filed an answer opposing habeas relief (Answer, ECF No. 10), and Petitioner filed a traverse. (Traverse, ECF No. 18.) Pursuant to Federal Rule of Civil Procedure 78, the Court will determine the claims presented in the petition on the written submissions of the parties.

I. PROCEDURAL HISTORY

Following a jury trial, on June 5, 2009, a judgment of conviction ("JOC") was entered against Petitioner in New Jersey Superior Court, Camden County upon his conviction by a jury of

first-degree aggravated manslaughter and two counts of third-degree hindering apprehension or prosecution. (JOC, ECF No. 11-3, at 1.)[1] Petitioner was sentenced to a total extended prison term of forty years. (Id. at 1.)

Petitioner filed an appeal of his conviction and sentence on October 7, 2009. (Notice of Appeal, ECF No. 11-4.) The New Jersey Superior Court, Appellate Division affirmed his conviction and sentence on May 8, 2012. (App. Div. Op., ECF No. 11-7.) Petitioner thereafter filed a petition for certification to the New Jersey Supreme Court, which was denied on November 9, 2012. (Sup. Ct. Order, ECF No. 11-11.) Petitioner did not file a petition for certiorari to the United States Supreme Court. (Pet., ECF No. 1, at 7.)

On December 12, 2012, Petitioner filed a Verified Petition for Post-Conviction Relief ("PCR") in the Superior Court of New Jersey, Camden County. (PCR Pet., ECF No. 11-13.) The PCR Court denied the petition on February 6, 2014. (Order on Post-Conviction Applications on Indictable Offenses, ECF No. 11-17.) On April 11, 2014, Petitioner filed a Notice of Appeal of the PCR court's

---

[1]     Petitioner was originally charged, via indictment, with one count of first-degree murder, one count of first-degree conspiracy to commit murder, three counts of third-degree possession of a weapon for an unlawful purpose, three counts of fourth-degree unlawful possession of a weapon, one count of third-degree endangering an injured victim, and four counts of third-degree hindering apprehension or prosecution. (Indictment, ECF No. 11-1.)

decision and a Motion to File Notice of Appeal as Within Time with the New Jersey Superior Court, Appellate Division. (<u>See</u> Notice of Appeal, ECF No. 11-18; App. Div. Order, ECF No. 11-19.) The Appellate Division granted Petitioner's motion on May 6, 2014. (App. Div. Order, ECF No. 11-19.) On April 18, 2016, the Appellate Division affirmed the denial of Petitioner's PCR petition. (App. Div. Op., ECF No. 11-22.) Petitioner filed a timely petition for certification to the New Jersey Supreme Court, which was denied on September 12, 2016. (Sup. Ct. Order, ECF No. 11-25.) Petitioner filed the instant petition on August 18, 2017. (Pet., ECF No. 1.)

II.  BACKGROUND

The factual background in this matter was summarized by the New Jersey Superior Court, Appellate Division upon Petitioner's direct appeal. (App. Div. Op, ECF No. 11-7.)

> At the trial, the State presented evidence which established that on March 20, 2006, defendant walked into Oaklyn police headquarters and claimed he suspected there was a dead body in his apartment in Gloucester City. Defendant consented to a search of his apartment and his garbage. Officers from the Gloucester City Police Department entered defendant's apartment and found the dead body of Lisa Hoopes (Hoopes) lying on the couch, covered with a blanket, with duct tape around her neck. Hoopes and the couch were covered in blood, and there was a considerable amount of blood in the apartment.
>
> The police found a bloody pair of scissors, a trash bag full of clothes in the oven, and a bloody hammer inside the microwave. Around ten o'clock that morning, defendant was taken

to the offices of the Camden County
Prosecutor, where he was questioned by
Investigators John Greer and James Bruno, and
Detective Mark Ridge. Defendant was informed
of his Miranda rights. He signed a written
waiver of those rights.

Defendant told the investigators that, on the
previous Friday, March 17, 2006, he ingested
cocaine in his apartment with Karen Ann
Sluzalis (Sluzalis) and Brian Springer
(Springer). At some point, Mark Berky (Berky),
a person defendant knew from the neighborhood,
arrived and Springer left. Later that night,
defendant and Berky left the apartment to
purchase liquor, leaving Sluzalis alone.
While defendant and Berky were out, they met
Hoopes, who returned to the apartment with
them. Hoopes, Berky and Sluzalis later left.

Very early on Saturday, March 18, 2006, Berky
returned to defendant's apartment and asked
defendant to bring Sluzalis's car to her with
"two bags of dope and $20.00[.]" When
defendant arrived at Sluzalis's apartment, she
was upset. She said that Berky and Hoopes had
"played" him. Defendant and Sluzalis then
"started shootin' some coke[.]"

At some point, Sluzalis called Hoopes and
arranged to meet her at defendant's apartment.
Sluzalis went to meet Hoopes later Saturday
morning. When she returned, she had blood on
her hands and appeared disheveled. Defendant
asked what happened but did not press her. He
remained at Sluzalis's apartment until she
kicked him out early Monday morning, at which
point, he went to the police, as he said, "to
cover [his] ass[.]"

Defendant told the investigators that Sluzalis
had "some type of" altercation with Hoopes in
his apartment on Friday night, and he was
concerned that if he went home, he would be
"walking into ... somethin[g]" that he was not
"aware of" and which he wanted "no part of."
After about an hour, defendant invoked his

4

right to counsel and his right to remain
silent. The interview ended. Defendant was
placed under arrest. He was required to
remove his boots before being placed in a
holding cell. After observing bloodstains on
defendant's boots, the investigators obtained
a warrant to seize defendant's boots and
clothing. On March 20, 2006, the
investigators obtained DNA samples from
defendant and Sluzalis.

Later that day, defendant told the
investigators he wanted to provide them with
more information, but said that he did not
want to speak with Greer, Bruno or Ridge.
Around 5:30 p.m., Investigators Eric Wren and
Diane Wilson interviewed defendant. Before
that interview, defendant was again informed
of his Miranda rights, and he again signed a
waiver of those rights.

In his second interview, defendant said that
on March 18, 2006, he was in his apartment
with Springer and Sluzalis, when Sluzalis
invited Hoopes to the apartment. Hoopes
arrived and, at some point thereafter,
defendant was with Springer in the kitchen
when they heard a commotion in the living
room. They found Sluzalis and Hoopes engaged
in a physical altercation.

Defendant stated that "somebody had a
knife[.]" It was a four-inch, camouflage,
switchblade that Sluzalis always carried. He
said that he initially thought Springer was
trying to pull the two women apart, but then
he realized that Springer was also hitting
Hoopes. According to defendant, Sluzalis
pulled a hammer from his tool box and struck
Hoopes with it. Springer then did the same.

Defendant claimed that he did not participate
in the attack but saw that Hoopes was
suffering and attempted to "put her out of her
misery" by "stomp[ing] her one time[,]" like
he had once done with an injured baby bird.

> Defendant stated that, despite the injuries, Hoopes managed to pull herself onto the couch.
>
> Defendant did not attempt to help Hoopes because he "felt a little bit threatened[,]" by Sluzalis and Springer. After the attack, defendant, Sluzalis and Springer put the hammer in the microwave and poured bleach on the knife before throwing it into the trash dumpster. After the second interview, defendant was transported to a hospital because of complications from diabetes.

(Id. at 2-6 (alterations in original).)

III. STANDARD OF REVIEW

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. See Eley v. Erickson, 712 F.3d 837, 846 (3d Cir. 2013); see also Parker v. Matthews, 567 U.S. 37, 40-41 (2012). Under 28 U.S.C. § 2254, district courts are required to give great deference to the determinations of the state trial and appellate courts. See Renico v. Lett, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary
> to, or involved an unreasonable application
> of, clearly established Federal law, as
> determined by the Supreme Court of the United
> States; or
>
> (2) resulted in a decision that was based on
> an unreasonable determination of the facts in
> light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d)(1)-(2).  Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court.  See Woods v. Donald, 135 S. Ct. 1372, 1376 (2015).  "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong."  Id.  Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

IV. DISCUSSION

A. Timeliness of the Petition

1. Parties' Arguments

Respondents contend the petition should be dismissed as time-barred because it was filed after the expiration of the one-year

statute of limitations for § 2254 petitions under 28 U.S.C. § 2244.
(Answer, ECF No. 10, at 16–19.) Respondents assert that Petitioner
filed his appeal of his PCR petition after the time to do so had
expired and, thus, the limitations period ran for 42 days between
the day Petitioner's time for filing an appeal expired and the day
the Appellate Division granted Petitioner's Motion for Leave to
File a Notice of Appeal as Within Time. (Id. at 17–18.)
Respondents assert that once the Supreme Court of New Jersey denied
certification on September 12, 2016, Petitioner had 323 days left
to file his habeas petition. (Id. at 18.) Respondents argue that
those 323 days expired on July 31, 2017, 18 days before the instant
petition was filed on August 18, 2017. (See id.)

Petitioner maintains that the petition is, in fact, timely.
Petitioner argues that the one-year statute of limitations was
tolled until the day the Supreme Court of New Jersey denied
certification, September 12, 2016. (Traverse, ECF No. 18, at 15.)
Petitioner contends that he had until September 12, 2017 to file
any petition for habeas relief and that the instant petition was
filed before the expiration of that time. (Id.)

### 2. Legal Standard

28 U.S.C. § 2244(d) provides, in pertinent part:

> (1) A 1-year period of limitation shall apply
> to an application for a writ of habeas corpus
> by a person in custody pursuant to the
> judgment of a State court. The limitation
> period shall run from the latest of—

> (A) the date on which the judgment
> became final by the conclusion of
> direct review or the expiration of
> the time for seeking such review;
>
> . . .
>
> (2) The time during which a properly filed
> application for State post-conviction or other
> collateral review with respect to the
> pertinent judgment or claim is pending shall
> not be counted toward any period of limitation
> under this subsection.

After a petitioner seeks review from the State's highest court, the judgment of conviction becomes final, and the limitations period begins to run after expiration of the 90-day period for filing a petition for writ of certiorari in the United States Supreme Court. Swartz v. Meyers, 204 F.3d 417, 419 (3d Cir. 2000).

Pursuant to § 2244(d)(2), only a properly filed application for State post-conviction review or other collateral review tolls the habeas statute of limitations. Pace v. DiGuglielmo, 544 U.S. 408, 413 (2005). An application for PCR is "*properly* filed when its 'delivery and acceptance are in compliance with the applicable laws and rules governing filings' including 'time limits upon its delivery.'" Id. (quoting Artuz v. Bennett, 531 U.S. 4, 8, 11 (2000)). The state court's acceptance of an application is "an important indication that the pleading is properly filed." Id.

(quoting <u>Jenkins v. Superintendent of Laurel Highlands</u>, 705 F.3d 80, 87 (3d Cir. 2013)).

A properly filed application will toll the limitations period during the period between a lower state court's decision and the timely filing of an appeal of that decision, <u>Carey v. Saffold</u>, 536 U.S. 214 (2002), and through the time in which an appeal could have been filed, even if no appeal is filed, <u>Swartz</u>, 204 F.3d at 420-24.  Furthermore, the tolling provision does not reset the date from which the one-year limitation period begins to run. <u>Johnson v. Hendricks</u>, 314 F.3d 159, 161–62 (3d Cir. 2002).

Even if the statutory limitations period has passed, a petition may overcome that limitation if he can show a basis for equitable tolling.  <u>Fahy v. Horn</u>, 240 F.3d 239, 244 (3d Cir. 2001). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements:  (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way." <u>Ross v. Varano</u>, 712 F.3d 784, 798 (3d Cir. 2013) (citations omitted).  "The diligence required for equitable tolling purposes is reasonable diligence." <u>Id.</u> at 799.  The obligation to exercise reasonable diligence includes the period when a petitioner is exhausting state remedies. <u>Id.</u> "The fact that a petitioner is proceeding pro se does not insulate him form the 'reasonable diligence' inquiry and his lack of legal knowledge

or legal training does not alone justify equitable tolling." <u>Id.</u> at 800.

### 3. <u>Analysis</u>

Petitioner's conviction and sentence were imposed by the trial court on June 5, 2009. (JOC, ECF No. 11-3, at 1.) Petitioner filed an appeal and the New Jersey Superior Court, Appellate Division affirmed his conviction on May 8, 2012. (App. Div. Op., ECF No. 11-7.) The New Jersey Supreme Court denied certification on November 9, 2012. (N.J. Sup. Ct. Order, ECF No. 11-11.) Petitioner did not file a petition for writ of certiorari with the United States Supreme Court within ninety days after the New Jersey Supreme Court denied his petition. Accordingly, Petitioner's conviction became final under the AEDPA when the 90-day period expired on February 7, 2013.[2] <u>Swartz</u>, 204 F.3d at 419.

Petitioner filed his PCR petition in the New Jersey Superior Court on December 12, 2012, before his conviction became final under the AEDPA. (<u>See</u> PCR, ECF No. 11-13.) Thus, while the statute of limitations began to run the day Petitioner's conviction

---

[2]     Federal Rule of Civil Procedure 6 describes how to compute any time period in any statute that does not specify a method of computing time. Fed. R. Civ. P. 6(a). In computing time, one should exclude the day of the event that triggers the period; count every day including intermediate Saturdays, Sundays and legal holidays; and include the last day of the period unless it is a Saturday, Sunday or legal holiday, in which case it runs until the next day. Fed. R. Civ. P. 6(a)(1)(A)-(C).

became final, it was immediately statutorily tolled under §
2244(d)(2) because of the pending PCR proceeding.

The Superior Court denied the PCR petition on February 6,
2014. (Order on Post-Conviction Applications on Indictable
Offenses, ECF No. 11-17.) Under the New Jersey Court Rules,
Petitioner's time to file an appeal expired on March 24, 2014, 45
days after the PCR petition was denied. N.J. Ct. R. 2:4-1(a).
Petitioner did not file a timely notice of appeal during that
period.

Respondents argue that the limitations period thus ran from
the day Petitioner's time to file an appeal expired, March 24,
2014, to the day the Appellate Division granted his Motion for
Leave to File a Notice of Appeal as Within Time, May 6, 2014,
amounting to a total of 42 days. (ECF No. 10, at 18.) Petitioner,
on the other hand, argues that the statute of limitations was
tolled for the pendency of his PCR proceeding and that it did not
begin to run until September 12, 2016, when the New Jersey Supreme
Court denied certification.

The law in the Third Circuit as to how the filing of an
untimely appeal in the state court affects the running of the
limitations period is unsettled. In Swartz, on which Respondents
rely, the Third Circuit did not need to reach the issue of whether
the habeas statute of limitations should toll while a request for
permission to file a timely appeal (out of time) was pending before

the court.   204 F.3d 417, 424 (3d Cir. 2017); <u>see also</u> <u>Douglas v.</u>
<u>Horn</u>, 359 F.3d 257, 262 n.9 (3d Cir. 2004) (observing that its
"comments with respect to the statute of limitations not being
tolled during the time that a <u>nunc</u> <u>pro</u> <u>tunc</u> request for allowance
of appeal was pending were not necessary to [its] result").
Nevertheless, it stated, in <u>dicta</u>, that the time during which a
request for permission to file an appeal as in time would not toll
the limitations period.   <u>Id.</u> at 423 n.6.

      Since <u>Swartz</u>, however, the Third Circuit has held, albeit in
a nonprecedential opinion, that the time in which a motion for
leave to file an out-of-time appeal is pending is excluded from
the statute of limitations.   <u>Thompson v. Administrator N.J. State</u>
<u>Prison</u>, 701 F. App'x 118, 122–23 (3d Cir. 2017) (observing that
"the proper period of exclusion for § 2244(d) purposes is 'all
time between the filing of the request to excuse the default and
the state court's decision on the merits (if it elects to excuse
the default)'" (quoting <u>Fernandez v. Sternes</u>, 227 F.3d 977, 979
(7th Cir. 2000)).   The approach set forth in <u>Thompson</u> has been
largely followed by other courts in this District.   <u>See, e.g.</u>,
<u>Alvarenga v. Lagana</u>, 2016 WL 3610156, at *1 (D.N.J. July 1, 2016)
("[S]tatutory tolling does not include the period between the
expiration of time to appeal and when the appeal was actually
filed."), <u>aff'd sub nom</u>, <u>Alvarenga v. Admin. N. State Prison</u>, No.
16-3538, 2016 WL 9631331 (3d Cir. Dec. 8, 2016) (denying

certificate of appealability); see also Brown v. Powell, No. 17-10687, 2019 WL 1529645 (D.N.J. Apr. 9, 2019) (determining that limitations period ran from date petitioner's time to file an appeal expired until out-of-time notice of appeal was filed); Barge v. Att'y Gen. of N.J., No. 18-12033, 2018 WL 5784994, at *2 (D.N.J. Nov. 5, 2018) (same).

Here, Petitioner's out-of-time appeal was accepted by the Appellate Division as timely. (App. Div. Order, ECF No. 11-19.) Because the state court's acceptance of a filing is the critical indicator as to whether the filing was "properly filed," and out of an abundance of caution due to the unsettled state of the law on this issue, the Court will find that the statute of limitations ran only from March 24, 2014, the date Petitioner's time to file an appeal expired, until April 11, 2014, the date he filed his Notice of Appeal and Motion for Leave to File a Notice of Appeal as Within Time, amounting to a total of 18 days.

The limitations period remained tolled until the New Jersey Supreme Court denied certification on September 12, 2016. At that time, there were 347 days left for Petitioner to file a petition for habeas relief. Petitioner filed the instant petition on August 17, 2017, nine days before his time to do so expired, making it timely under the one-year AEDPA statute of limitations.

B. Ground One: Violation of Miranda Rights

1. The Parties' Arguments

In Petitioner's first ground for relief, he claims that his Fifth Amendment rights, as set forth in Miranda v. Arizona, 384 U.S. 436 (1966), were violated during his second interrogation at the Camden County Prosecutor's Office. (Pet., ECF No . 1, at 9.) Petitioner asserts that after he reported the presence of a possible homicide victim in his apartment on July 20, 2007, he waived his Miranda rights and was interrogated for approximately one hour by Investigators Bruno, Ridge, and Greer before the investigators briefly left the room. (Id.) When the investigators returned, Petitioner he "informed them that he was becoming 'uncomfortable' with the interrogation and was invoking his right to counsel." (Id. at 10.)

Petitioner asserts that after he invoked his Miranda rights "[t]he [i]nvestigators' tactics changed." (Traverse, ECF No. 18, 6.) Petitioner alleges that the investigators ignored his invocation of his rights and instead repeatedly inquired as to whether he wanted something to eat and how often he required insulin. (Id.) Petitioner argues that these questions "reinforced [his] knowledge of the power the investigators had in providing or withholding his needs" and coerced him into to providing his second statement to investigators. (Id.) Petitioner also argues that he was never told why he was under arrest and, had he known he was being arrested for murder, "there is a substantial likelihood he would not have waived his rights." (Id. at 7.)

Respondents argue that Petitioner's second statement was voluntarily made and, in fact, was initiated by Petitioner. (Answer, ECF No. 10, at 23-24.) Consequently, Respondents maintain that the state court reasonably applied <u>Miranda</u> to Petitioner's claim and made a reasonable determination of fact that Petitioner's second statement was "completely voluntary." (<u>Id.</u>)

### 2. The State Court Decision

On habeas review, the district court must review the last reasoned state court decision on each claim. <u>Ylst v. Nunnemaker</u>, 201 U.S. 797, 803 (1991). For Ground One, the last reasoned state court decision is the Appellate Division's opinion on direct review. The Appellate Division affirmed the decision of the trial court that Petitioner's second statement to law enforcement was voluntarily made:

> Here, the record indicates that defendant voluntarily appeared at the Oaklyn police station and reported that there may be a dead body in his apartment. The police went to the apartment and found Hoopes's body. It appeared that she had been murdered. The police transferred defendant to the prosecutor's office. He was left alone in an interview room for approximately two hours and provided with food before being interviewed. The interview continued for about one hour, until sometime around 1:30 or 1:45 p.m., when defendant invoked his right to counsel.
>
> The questioning stopped. The investigators asked defendant whether he wanted something to eat or drink, and defendant asked for "a little lunch[.]" Defendant is diabetic. The investigators also asked him if he needed a

dose of insulin.  Thereafter, defendant was left alone for approximately four hours and no one spoke with him about the case.

Defendant was provided with access to a restroom during that period.  Around 5:15 p.m., Investigator Wren checked on defendant before leaving the office for the evening. Defendant asked for a cup of coffee and a cigarette, which were provided to him.  He was allowed to use the restroom.  As defendant was returning to the holding cell from the restroom, he told Wren that he "ha[d] some details I want to fill you in on."

Wren offered to get the investigators who previously interviewed defendant but defendant expressed a preference to speak to Wren claiming that "I didn't like the other two investigators.  They kept asking me the same questions over and over again and they made me feel like I was a liar...."

Defendant was again advised of his <u>Miranda</u> rights.  He interrupted the recitation of rights, seeking assurances that he could stop the interview if he pleased "like I did the other time."  Defendant agreed to waive his rights and the second interview followed.

Defendant argues that the offers to provide food or drink, and the inquiries concerning his medical needs, were an attempt by the investigators to pressure him to revoke his assertion of his right to counsel and to "break down his will[.]"  The trial court found, however, that defendant's statement "was completely voluntary with full understanding of his rights without any coercion."

The court noted that, in his answers to the investigator's questions, defendant indicated that he fully understood his rights, including his right to counsel.  The court also noted that the investigators scrupulously honored defendant's assertion of his right to counsel

and ceased questioning him but later defendant
voluntarily initiated further discussion.

The court pointed out that the investigators
again informed defendant of his <u>Miranda</u> rights
and found that defendant knowingly,
voluntarily and intelligently waived those
rights before making the second statement.
The court's findings are entitled to our
deference because they are supported by
sufficient, credible evidence and they have
been substantially influenced by the court's
opportunity to see and hear the witnesses.

(App. Div. Op., ECF No. 11-7, at 11–14 (citations omitted)

(alterations in original).)

The Appellate Division similarly found that Petitioner's

argument that he could not have made a knowing and intelligent

waiver of his <u>Miranda</u> rights because he was not told the reason

for his arrest lacked merit. (<u>Id.</u> at 14–15.) The Appellate

Division explained:

Defendant was not deprived of information
essential to a knowing and intelligent waiver
of his right to remain silent. Defendant was
arrested after he reported to the Oaklyn
police that there may be a dead body in his
apartment, and after he gave his first
statement to the investigators at the
prosecutor's office. When he gave his second
statement to the investigators, defendant was
clearly aware that he was a suspect in a murder
investigation.

(<u>Id.</u> at 15.)

3. <u>Analysis</u>

The Fifth Amendment provides, in part, that no person "shall

be compelled in any criminal case to be a witness against himself."

U.S. Const. amend V. The Fourteenth Amendment incorporates the Fifth Amendment privilege against self-incrimination. See Malloy v. Hogan, 378 U.S. 1, 8 (1964). In Miranda, the Court held that "without proper safeguards the process of in-custody interrogation . . . contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. Pursuant to Miranda, a suspect in custody must be told, prior to interrogation, "'that he has the right to remain silent, that anything he says can be used against him in a court of law,' and be given the '[o]pportunity to exercise these rights . . . throughout the interrogation.'" Boyer v. Houtzdale, 620 F. App'x 118, 124 (3d Cir. 2015 (quoting Miranda, 384 U.S. at 479). After these warnings have been given, "the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." Id. However, if the individual expresses that he wishes to remain silent or requests counsel, any interrogation must cease. Id.

Whether statements made after an individual has invoked his Miranda rights are admissible depends on "'whether his right to cut off questioning' was 'scrupulously honored.'" Michigan v. Mosley, 423 U.S. 96, 104 (1975). The Mosley court "identified four factors that help decide whether a suspect's invocation of the right to remain silent and further questioning":

> (1) whether a significant amount of time
> lapsed between the suspect's invocation of the
> right to remain silent and further
> questioning; (2) whether the same officer
> conducts the interrogation where the suspect
> invokes the right and the subsequent
> interrogation; (3) whether the suspect is
> given a fresh set of <u>Miranda</u> warnings before
> the subsequent interrogation; and (4) whether
> the subsequent interrogation concerns the same
> crime as the interrogation previously cut off
> by the suspect.

<u>United States v. Lafferty</u>, 503 F.3d 293, 303 (3d Cir. 2007) (citing <u>Mosley</u>, 423 U.S. at 105–06).

The Appellate Division's decision was not contrary to this federal precedent nor was it an unreasonable application of that precedent. Petitioner has not presented any evidence to indicate that the investigators did not scrupulously honor his invocation of his rights. His second statement was made several hours after he first invoked his <u>Miranda</u> rights when he indicated to Investigator Wren that he wished to provide additional information. Before any questioning was conducted, he was again read his <u>Miranda</u> rights and provided with a second waiver of rights form, which he signed.

Moreover, Petitioner has not presented any evidence that would rebut the state court's finding that the investigator's inquiries as to whether Petitioner's need for food or insulin did not act to coerce Petitioner. Nor has Petitioner presented any

evidence to rebut the Appellate Division's finding that Petitioner was clearly on notice that he was a suspect in Hoopes' murder.

The totality of the circumstances underlying Petitioner's second custodial statement demonstrate that not only did the investigators scrupulously honor his invocation of his <u>Miranda</u> rights, his second waiver of those rights was made knowingly, intelligently, and voluntarily. Therefore, Ground One of the petition is denied.

    B.   <u>Ground Two: Ineffective Assistance of Counsel</u>

       1.   <u>The Parties' Arguments</u>

Petitioner next claims that he was denied the effective assistance of counsel in violation of the Sixth Amendment because his counsel failed to investigate his medical history before the <u>Miranda</u> hearing. (Pet., ECF No. 1, at 11.) Petitioner alleges that he suffers from diabetes and that he informed investigators of this fact when he arrived at the police station. (<u>Id.</u>) Petitioner claims that during the first interrogation, Investigator Greer asked if he required insulin, and Petitioner declined. (<u>Id.</u>) Following the first interrogation, Petitioner states he was detained in a holding cell for four hours and, despite making numerous requests for medical attention, he was only provided with water and a hamburger. (<u>Id.</u>)

Petitioner asserts that "[a]fter several hours of remaining in the cell his pain increased and he did not want to be in the

cell any longer and his mind was affected so much he agreed to talk to the police." (Id.) Shortly after the second interrogation, Petitioner was taken to the emergency room where he had a blood glucose level of 410. (Id.) Petitioner argues his counsel was ineffective because he failed to present evidence that Petitioner made repeated requests for medical attention while he was in custody and that he failed to conduct any investigation to receive the medical records indicating Petitioner's high blood glucose level. (Id.)

Respondents argue that the state courts properly applied the Strickland standard to Petitioner's ineffective assistance of counsel claim. (ECF No. 10, at 34.) Moreover, Respondents maintain that Petitioner has failed to demonstrate that his counsel was ineffective for not obtaining his medical records or presenting them at the Miranda hearing. (Id. at 33.)

### 2. The State Court Decision

The last reasoned opinion on this claim was the Appellate Division's decision on Petitioner's appeal of the denial of his PCR petition. The Appellate Division held that Petitioner had not established a prima facie case of ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1987). In so holding, the Appellate Division relied on the factual findings of the PCR Court:

[A]fter defendant's first interview, defendant was asked if he required insulin Defendant declined the officer's offer, indicating that he did not require any insulin at that time. The judge pointed out that, in his direct appeal, defendant acknowledged that he had been repeatedly offered food, drink and insulin.

The judge noted that, when the trial court denied defendant's motion to suppress, the court stated that defendant had been given food and drink, and assured that he would be taken to the hospital for insulin if and when he needed it. In addition, the trial court observed that, during the time he was interviewed, defendant did not "at any time" lose his focus or ability to understand.

The judge also noted that, in support of his PCR petition, defendant had submitted records of his hospitalization following his interviews. Those records had not been presented at the suppression hearing. The records indicated that, when defendant was taken to the hospital his blood sugar level was 410, and he had "nonspecific and nonlocaliz[ed] pains in the body" which were thought to be related to his uncontrolled diabetes. However, upon admission, the attending physician noted that defendant did not appear to be in acute distress, had no motor or sensory deficits, and was oriented.

[The judge] observed that, while defendant was hospitalized for three days, a report of a physical exam the day after admission indicated that defendant was feeling "back to normal" and was otherwise stable. The discharge summary indicated that defendant did not take a regular dose of insulin, and he had reported that he only takes insulin when he does not feel well and only when he wants to do so. The judge found that nothing in the medical records contradicted the trial court's findings at the suppression hearing, and the presentation of the medical records at the

> hearing would not have changed the outcome of
> the motion.

(App. Div. Op., ECF No. 11-22, at 10–11 (first alteration in original).)

### 3. Analysis

The Sixth Amendment right to counsel is the right to the effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 687–88 (1984). There are two elements to a Sixth Amendment ineffective assistance of counsel claim, deficient performance by counsel and prejudice. Premo v. Moore, 562 U.S. 115, 121 (2011). For the deficient performance prong, "a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness." Id. at 121 (internal quotations omitted) (quoting Harrington v. Richter, 562 U.S. 86, 104 (2011)). A petitioner must overcome a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Id. (quoting Harrington, 562 U.S. at 104). The burden a petitioner must meet is "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 121–22. (quoting Harrington, 562 U.S. at 104). Habeas review of counsel's performance is doubly deferential, and the question is not whether counsel's actions were reasonable but

whether there is any reasonable argument that counsel satisfied _Strickland_'s deferential standard.  _Id._ at 122–23.

To prove _Strickland_ prejudice, a petitioner must establish that "counsel's errors were so serious as to deprive the defendant of a fair trial."  _Strickland_, 466 U.S. at 669.  To establish prejudice, a petitioner must show that "there is a reasonable probability that the result of trial would have been different absent the deficient act or omission."  _Hinton v. Alabama_, 571 U.S. 236, 264 (2014).  On habeas review, it is not enough that a federal judge would have found counsel ineffective.  The judge must find that the state court's resolution of the issue was unreasonable.  _Harrington_, 562 U.S. at 101 (2011).

The state court's resolution of Petitioner's ineffective assistance of counsel claim was not unreasonable.  The medical records Petitioner argues his counsel should have obtained and presented at the _Miranda_ hearing do not contradict the findings of the trial court nor would admission of the records have demonstrated that Petitioner's _Miranda_ rights were violated in any way.  Petitioner cannot demonstrate that he was prejudiced in any way by his counsel's failure to obtain these records.  Accordingly, habeas relief on Ground Two is denied.

D.   <u>Ground Three: Violations of Petitioner's Due Process
     Rights</u>

   1.   <u>The Parties' Arguments</u>

In Ground Three, Petitioner appears to allege two violations
of his due process rights under the Fifth and Fourteenth
Amendments:   (1) that the jury's verdict for aggravated
manslaughter was against the weight of evidence and (2) that the
trial court erred in instructing the jury to sequentially consider
the lesser-included offenses of aggravated and reckless
manslaughter.   (<u>Id.</u>)

After the trial court instructed the jury as to the elements
of murder, it explained that if the jury found defendant not guilty
of first-degree murder, it should consider the lesser-included
offenses of aggravated or reckless manslaughter.   (ECF No. 11-34,
at 49-50.)   The trial court instructed the jury to consider these
offenses sequentially:

> If . . . you determine the State has not proven
> beyond a reasonable doubt that the Defendant
> purposely, or knowingly caused death or
> serious bodily injury resulting in death, then
> you must find the Defendant not guilty of
> murder and go on to consider whether the
> Defendant should be convicted of the crime of
> aggravated or reckless manslaughter.
>
> . . .
>
> A person is guilty of aggravated manslaughter
> if he recklessly causes the death of another
> under circumstances manifesting extreme
> indifference to human life.   In order for you
> to find a Defendant guilty of aggravated

> manslaughter, the State is required to prove
> each of the following elements beyond a
> reasonable doubt.  One, that the Defendant
> caused Lisa Hoopes' death.  Two, the Defendant
> did so recklessly.  And three, the Defendant
> did so under circumstances manifesting extreme
> indifference to human life.
>
> . . .
>
> If, however, after consideration of all the
> evidence, you're not convicted beyond a
> reasonable doubt that the Defendant acted
> recklessly causing Lisa Hoope's death under
> circumstances manifesting extreme
> indifference to human life, then your verdict
> must be guilty of aggravated manslaughter.

(Id. at 49-52.)  Petitioner was ultimately convicted of aggravated manslaughter.  (JOC, ECF No. 11-3, at 1.)

Petitioner argues that the jury's verdict is against the weight of evidence as the only basis for the conviction is "pure speculation and [the jury's] subjective sense of the egregiousness of the crime."  (Pet., ECF No. 1, at 13.)  Petitioner further argues that the trial court's instruction to consider murder and its lesser-included charges sequentially "deprived Petitioner of his due process right to have the jury deliberate upon a viable lesser included homicide offense."  (Id.)

Respondents first address Petitioner's argument that the jury's finding that Petitioner was guilty of aggravated manslaughter was against the weight of evidence.  (Ans., ECF No. 10, at 35-37.)  Respondents assert that the jury's verdict was a "rational decision" and that "in the absence of any showing that

no reasonable trier of fact could have found him guilty beyond a reasonable doubt," he is not entitled to habeas relief.

On the erroneous jury instruction claim, Respondents assert that the trial court's instruction was not erroneous. Accordingly, Respondents maintain that Petitioner cannot succeed on his due process claim.

## 2. The State Court Decision

The last reasoned opinion on both Petitioner's due process claims was the Appellate Division's decision on direct appeal.

### i. Verdict Against the Weight of Evidence

The Appellate Division rejected Petitioner's argument that there was insufficient evidence to support the jury's verdict for aggravated manslaughter. (App. Div. Op., ECF No. 11-7, at 16–18.) Indeed, the Appellate Division was "satisfied that the State presented sufficient evidence upon which a jury could find beyond a reasonable doubt that defendant acted with extreme indifference to human life when he stomped on Hoopes's face and kicked her in the head." (Id. at 17.) The Appellate Division further noted that

> Hoopes had already been seriously injured by the time [Petitioner] struck her and any further injury to her head could be fatal. Moreover, defendant stated that he stomped on Hoopes to put her "out of her misery." . . . In our view, the evidence allowed a jury to conclude that when defendant struck Hoopes, he did so with extreme indifference to whether she lived or died. The evidence showed that

when defendant struck Hoopes, the risk of
death was a probability, not a possibility.

(Id. at 17-18.)

ii.  Erroneous Jury Instruction

The Appellate Division similarly denied Petitioner's claim

that the trial court erred in instructing the jury to deliberate

sequentially on the murder charge and its lesser-included

offenses.  (Id. at 21-23.)  The Appellate Division determined that

The instructions employed here were not
erroneous and were not framed in a manner that
would deter the jury from returning a proper
verdict.  Although the court instructed the
jury to consider aggravated manslaughter
before considering reckless manslaughter, the
jury was not precluded from finding defendant
not guilty of the former offense and guilty of
the latter offense.  In our view, the
instructions provided the jury with a proper
framework for orderly deliberations.

(Id. at 22-23.)

3.  Analysis

i.  Verdict Against the Weight of Evidence

A claim that the jury's verdict was against the weight of

evidence, may arise to violation of due process if "after viewing

the evidence in the light most favorable to the prosecution, [no]

rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt."  Jackson v. Virginia, 443

U.S. 307, 319 (1979).  This "standard must be applied with explicit

reference to the substantive elements of the criminal offense as

defined by state law." Id. at 324 n.16. Critically, factual issues determined by a state court (jurors included) are presumed to be correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000).

The Appellate Division's decision was not contrary to or an unreasonable application of this federal precedent. Petitioner argues that there was insufficient evidence presented at trial to show, beyond a reasonable doubt, that he acted with extreme indifference to human life when he stomped on Hoopes's face and head. (Traverse, ECF No. 18, at 12.) However, as the Appellate Division found, there was evidence presented at trial that demonstrated that Petitioner struck Hoopes intending to "put her out of her misery." (App. Div. Op., ECF No. 11-7, at 17–18.) The Appellate Division, and the jury as evidenced by its verdict, concluded that Petitioner acted with extreme indifference as to whether Hoopes "lived or died." Petitioner has not met his burden of rebutting these findings and, therefore, habeas relief on this claim is denied.

## ii. Erroneous Jury Instruction

Jury instructions on the charges against a defendant in state court are governed by state law. See Estelle v. McGuire, 502 U.S. 62, 71–72 (1991) ("[T]he fact that the [jury] instruction was allegedly incorrect under state law is not a basis for habeas

30

relief."). However, a defendant may challenge jury instructions on habeas review if the instructions "violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973). When reviewing jury instructions, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Id. at 146–47. Ultimately, the question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Id. at 147.

New Jersey law dictates that "juries may not consider lesser-included offenses until they have acquitted of the greater offense." State v. Cooper, 700 A.2d 306, 325 (N.J. 1997). Thus, sequential charges will often be used to "provide a framework for orderly deliberations." Id. at 326 (quoting State v. Coyle, 574 A.2d 951, 966 (N.J. 1990)).

The Appellate Division reasonably concluded that the trial court gave proper instructions to the jury. The instructions permitted the jury to convict on the lesser-included offenses of aggravated manslaughter or reckless manslaughter depending on whether it found that Petitioner acted with extreme indifference to human life. The trial court's instruction to consider these offenses sequentially did not preclude the jury from considering the lesser-included offense of reckless manslaughter. The jury

instructions did not deprive Petitioner of a fundamentally fair trial in violation of his right to due process.

## V.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

For the reasons discussed above, Petitioner has not made a substantial showing of the denial of a constitutional right. Therefore, the Court will deny a certificate of appealability.

## V.    CONCLUSION

In the accompanying Order filed herewith, the Petition for habeas relief under 28 U.S.C. § 2254 is denied.


Dated: June 5, 2019

s/Renée Marie Bumb
**RENÉE MARIE BUMB**
**United States District Judge**